UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

J.K., individually, EDWARD K., JR., individually and as parent of J.K., and SALLY K., individually and as parent of J.K.,

Plaintiffs,

v.

**DECISION AND ORDER**
02-CV-765S

SPRINGVILLE-GRIFFITH INSTITUTE CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION,

Defendant.

## I. INTRODUCTION

In this action, Plaintiffs allege that their local school district denied J.K., a disabled child, a free appropriate public education ("FAPE"), in violation of the Individuals with Disabilities in Education Act, 20 U.S.C. § 1415(i)(2) ("IDEA"). Plaintiffs also allege non-IDEA violations of federal and state laws concerning discrimination against disabled persons and the education of children with disabilities. At issue is whether Defendant Springville-Griffith Institute Central School District Board of Education ("Springville") provided J.K. with a FAPE during the 2002-2003 school year.

Currently before this Court are three motions: (1) Plaintiffs' Second Motion to Substitute Party,[1] (2) Plaintiffs' Motion for Leave to Amend/Correct their response to

[1] In support of this motion, Plaintiffs filed the Affirmation of Andrew K. Cuddy, Esq. Springville did not file a response.

Springville's Motion for Summary Judgment,[2] and (3) Springville's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure[3]. For the following reasons, Plaintiffs' motions are denied and Springville's motion is granted.

## II. BACKGROUND

### A. The IDEA

The IDEA is intended to secure appropriate education for children with disabilities. See Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). Specifically, Congress enacted the IDEA

> [T]o ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, [and] to ensure that the rights of children with disabilities and parents of such children are protected.

20 U.S.C. § 1400 (d)(1)(A)-(B).

Under the IDEA, states are given federal funds to assist them in "provid[ing] disabled children with 'a free appropriate public education' in the least restrictive environment." Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 481 (2d Cir. 2002) (citing 20 U.S.C. §§ 1400 (d)(1)(A), 1401 (8), 1411 (a)(1), & 1412 (a)(5)(A)). In this regard, "[t]he IDEA expresses a strong preference for the educational mainstreaming of children with disabilities to the maximum extent appropriate, and

---

[2]In support of this motion, Plaintiffs filed the Affirmation of Andrew K. Cuddy, Esq. In opposition, Springville filed the Declaration of Kathleen Sellers, Esq.

[3]In support of this motion, Springville filed a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Declaration of Jerome D. Schad, Esq., with attached exhibits, and a reply memorandum of law. In opposition, Plaintiffs filed a memorandum of law, a Statement of Undisputed Facts and the Declaration of Andrew K. Cuddy, Esq., with attached exhibits.

therefore special education and related services must be provided in the least restrictive setting consistent with a child's needs." Bd. of Educ. of the Poughkeepsie City Sch. Dist. v. O'Shea, 353 F.Supp.2d 449, 453-54 (S.D.N.Y. 2005) (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)) (internal quotations omitted).

"To meet the requirements of the IDEA, a school district must provide each student with a disability with 'special education and related services' designed to serve the student's needs." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (quoting 20 U.S.C. § 1401(8)). To that end, school districts "must implement individualized education programs ["IEP"] on an annual basis for each student with a disability." See id. (citing 20 U.S.C. § 1414(d)). In New York, a student's IEP is produced by a Committee on Special Education ("CSE") composed of members appointed by school boards or trustees of school districts. See Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist., 281 F.Supp.2d 710, 712 (S.D.N.Y. 2003). An "IEP Team" comprised of school officials and teachers with special education expertise, along with the student's parents, must review the student's IEP annually. Id. The IEP must state:

> (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

J.R. and B.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F.Supp.2d 386, 393-94 (S.D.N.Y. 2004) (quoting Walczak, 142 F.3d at 122 (citing 20 U.S.C. § 1401(a)(2)).

Ultimately, "school districts must (1) comply with certain procedural mandates in the [IDEA] when formulating an IEP for a disabled student, and (2) ensure that the substantive contours of the IEP adopted are reasonably calculated to confer an educational benefit upon the child." Watson, 325 F.Supp.2d at 144 (citing Rowley, 458 U.S. at 201).

However, the IDEA does not require school districts to provide the best educational opportunities available:

> While the IDEA requires districts to provide appropriate education to disabled students, this is not necessarily synonymous with offering disabled students the best educational opportunities available. The IDEA only requires that districts give disabled students a 'basic floor of opportunity . . . consisting of access to specialized institutions and related services which are individually designed to provide educational benefit.'

Watson v. Kingston City Sch. Dist., 325 F.Supp.2d 141, 144 (N.D.N.Y. 2004) (quoting Rowley, 458 U.S. at 201); see also Grim, 346 F.3d at 379. Therefore, the IDEA does not mandate provision of the best education that money can buy, nor does it require that school districts provide "everything that might be thought desirable by loving parents." Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989).

Parents of disabled students are provided with "an array of procedural safeguards designed to help ensure the education of their child . . . ." Polera, 288 F.3d at 482 (citing 20 U.S.C. § 1415 (a)). Residents of New York who believe that an IEP is insufficient under the IDEA may request a due process hearing before an impartial hearing officer ("IHO")

appointed by the local board of education. See Grim, 346 F.3d at 379 (citing 20 U.S.C. § 1415(f) & N.Y. EDUC. L. § 4404(1); see also O'Shea, 353 F.Supp.2d at 454 ("Parents who are ultimately dissatisfied with an IEP may request, pursuant to IDEA-mandated procedures, a hearing to be held before a school board appointed IHO."). Any decision by the IHO may be appealed to the Office of State Review. See Grim, 346 F.3d at 379; N.Y. EDUC. L. § 4404(2). Challenge to a State Review Officer's ("SRO") decision is either through Article 78 proceedings in New York State Supreme Court or a civil action in federal district court. See O'Shea, 353 F.Supp.2d at 454-55; Antonaccio, 281 F.Supp.2d at 713. Throughout the process, the school district bears the burden of proving by a preponderance of evidence that it has complied with IDEA's procedural requirements and that its IEP is reasonably calculated to confer educational benefits on the student. O'Shea, 353 F.Supp.2d at 454.

**B. Facts**

At the relevant times herein, J.K., a child with autism, and his mother and father, Sally K. and Edward K., Jr., lived in the Springville School District. Springville is a small, rural school district located in Western New York. During the 2002-2003 school year, J.K. was in the third grade. (Springville's Statement of Undisputed Facts Pursuant to Local Rule 56.1, ¶ 1.)

In April of 2002, Springville's CSE recommended an IEP for J.K. (Schad Decl., ¶ 4.) The CSE recommended that J.K. be placed in an out-of-district Board of Cooperative Educational Services ("BOCES") 1:6+1 special class (i.e., one special education teacher, no more than six students and one aide). (Schad Decl., ¶ 4.)

On April 25, 2002, Edward K., Jr. challenged this recommendation by initiating a due process hearing as provided for under New York law. (Schad Decl., ¶ 5.) Thereafter, IHO Aaron Turetsky received testimony over six days from May 31, 2002, through July 24, 2002. (Schad Decl., ¶ 5.)

IHO Turetsky issued a decision on August 13, 2002 (the "Turetsky Decision").[4] The Turetsky Decision (1) ordered Springville to place J.K. "in a class comprised of special education and regular education students to be cooperatively taught by a special education and a regular education teacher," (2) directed Springville to reconsider and redetermine all other components of J.K.'s IEP for the 2002-2003 school year, (3) ordered Springville to conduct a Functional Behavioral Assessment ("FBA") of J.K. "as the CSE deems fit," and (4) retained jurisdiction over the matter in the event that further intervention was required. (Turetsky Decision, p. 10-11).

Springville appealed the Turetsky Decision to the New York State Office of State Review. (Schad Decl., ¶ 7.) In the meantime, Springville determined that the proper placement for J.K. during the pendency of its appeal of the Turetsky Decision ("pendency placement") was in the 1:6+1 class at North Collins. (Schad Decl., ¶ 11.) Unsatisfied with that determination, Edward K., Jr. and Sally K. did not send J.K. to the special class in the North Collins school district. (Schad, Decl., ¶ 14.)

On August 30, 2002, Sally K. initiated a due process hearing to challenge J.K.'s pendency placement and Springville's failure to implement the Turetsky Decision. (Schad Decl., ¶12.) IHO James Walsh conducted a due process hearing on October 4 and 8,

---

[4]A copy of the Turetsky Decision is attached to the Declaration of Jerome D. Schad as Exhibit A.

2002. (Schad Decl., ¶ 12.) IHO Walsh issued a decision on October 23, 2002 (the "Walsh Decision").[5] Therein, IHO Walsh found that J.K.'s pendency placement was appropriate. That is, that during the pendency of Springville's appeal of the Turetsky Decision, J.K.'s appropriate placement was in the 1:6+1 class at North Collins. (Walsh Decision, at 19, 22.) However, IHO Walsh also determined that if the Office of State Review did not decide Springville's appeal within the time period established under New York law, and did not extend that deadline, J.K. should be placed according to the Turetsky Decision. (Walsh Decision, at p. 20-22.) Springville appealed that portion of the Walsh Decision that provided for J.K. to be placed according to the Turetsky Decision within the given time frame. (Schad Decl., ¶ 15.) Plaintiffs filed this federal court action while Springville's appeals of the Turetsky and Walsh Decisions were pending with the Office of State Review.

On October 29, 2002, Edward K., Jr. and Sally K., along with two paralegals from their attorney's law firm, met with Springville's CSE. (Schad Decl., ¶ 20.) After lengthy discussions, the parties fashioned an educational program for J.K. that would place him back into Springville's elementary school building (the "October 29th program"). (Schad Decl., at ¶ 13.) It was further decided that Springville's CSE would meet again in mid-November of 2002. (Schad Decl., ¶ 21.) That meeting did not take place until February 26, 2003. (Schad Decl., ¶ 22.)

On January 15, 2003, State Review Officer ("SRO") Frank Munoz issued a decision

---

[5]A copy of the Walsh Decision can be found in the Administrative Record at Exhibit 12, Tab 11, Sub-Tab C.

affirming the Turetsky Decision with respect to J.K.'s educational program.[6] (Schad Decl., ¶ 8.) On January 31, 2003, SRO Munoz granted Springville's appeal of the Walsh Decision and annulled that portion of the Walsh Decision that mandated that placement pursuant to the Turetsky Decision be completed within the time frame set by IHO Walsh. (Schad Decl., ¶ 16.)

On February 26, 2003, Springville's CSE met regarding J.K.'s educational program and placement for the 2002-2003 school year and to develop an IEP for the balance of the 2002-2003 school year.[7] (Schad Decl., ¶ 22.) This IEP provided for J.K.'s placement in a general education setting similar to the ones suggested in the Turetsky and Munoz Decisions. (Schad Decl., ¶ 23.) Still unsatisfied with J.K.'s placement and IEP, Edward K., Jr. and Sally K. requested a due process hearing on May 20, 2003. Therein, they raised substantially the same issues and allegations that are at issue in this federal litigation. (Schad Decl., ¶ 26.)

Plantiffs' due process proceedings were assigned to IHO Steven J. Goldsmith, who conducted a 7-day due process hearing. On November 25, 2003, IHO Goldsmith issued a 60-page decision (the "Goldsmith Decision") in favor of Springville.[8] Plaintiffs' appeal of the Goldsmith Decision was dismissed by SRO Paul F. Kelly on April 6, 2004 (the "Kelly

---

[6]SRO Munoz reversed IHO Turetsky with respect to one issue not directly related to J.K.'s educational program. In his decision, Turetsky stated that he was retaining jurisdiction over any future disagreement regarding implementation of his decision. SRO Munoz found that Turetsky exceeded his authority by assuming this type of general jurisdiction.

[7]This Court notes that Edward K., Jr. and Sally K. also filed a due process request on January 7, 2003. (Schad Decl., ¶ 17.) That request was dismissed on February 22, 2003. (Schad Decl., ¶ 19.)

[8]A copy of the Goldsmith Decision can be found in the Administrative Record at Exhibit 24.

Decision").[9]

## II. Procedural History

On October 31, 2002, Plaintiffs commenced this action by filing a Complaint in the United States District Court for the Western District of New York. Plaintiffs alleged that Springville and the New York State Education Department ("State Ed") were liable for various violations of state and federal education and disability laws.

On that same date, Plaintiffs moved for a preliminary injunction. This Court heard oral argument regarding that motion on December 4, 2002. At that time, this Court also granted Plaintiffs' request for leave to file an Amended Complaint. On December 30, 2002, this Court filed a Decision and Order denying Plaintiffs' Motion for a Preliminary Injunction.

Plaintiffs filed an Amended Complaint on January 8, 2003. The Amended Complaint asserted five causes of action against both Defendants. On January 23, 2003, Springville filed a Motion to Dismiss the Amended Complaint pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure. State Ed filed a Motion to Dismiss the Amended Complaint on January 24, 2003. On July 31, 2003, this Court filed a Decision and Order granting in part and denying in part Springville's Motion to Dismiss, and granting State Ed's Motion to Dismiss in its entirety.[10] This Court also directed Plaintiffs to file a Second Amended Complaint.

Plaintiffs filed their Second Amended Complaint on September 3, 2003. On September 15, 2003, Springville moved for an Order dismissing the Second Amended

---

[9]A copy of the Kelly Decision can be found in the Administrative Record at Exhibit 27.

[10]State Ed was officially terminated as a defendant in this case on September 3, 2003.

Complaint or requiring Plaintiffs to file a Third Amended Complaint. On November 7, 2003, this Court filed a Decision and Order striking the Second Amended Complaint and directing Plaintiffs to file a Third Amended Complaint.

Plaintiffs filed their Third Amended Complaint on December 3, 2003, alleging four causes of action against Springville. Springville filed its Answer to the Third Amended Complaint on December 17, 2003. Thereafter, on May 5, 2004, Springville filed the instant Motion for Summary Judgment. While Springville's Motion for Summary Judgment was pending, J.K.'s father, Edward K., Jr., passed away. Since Edward K, Jr. was a named plaintiff in this case, Plaintiffs filed a Motion to Substitute Party on August 30, 2004. On September 2, 2004, this Court filed a Decision and Order denying Plaintiffs' Motion to Substitute Party with leave to refile. Plaintiff filed its Second Motion to Substitute, which is currently before this Court, on September 20, 2004.

On October 20, 2004, six days before the scheduled oral argument on Springville's Motion for Summary Judgment, Plaintiffs filed a Motion to Amend/Correct their response to Springville's motion. Plaintiffs' then failed to appear at oral argument on October 26, 2004. This Court took the outstanding motions under advisement at that time without argument.

## III. DISCUSSION

### A. Plaintiffs' Second Motion to Substitute Party

This Court was advised of Edward K, Jr.'s passing at a status conference on July 14, 2004. At that time, this Court directed Plaintiffs to file a Motion to Substitute Party pursuant to Rule 25 of the Federal Rules of Civil Procedure. Plaintiffs filed their motion as directed.

In a Decision and Order filed on September 2, 2004, this Court denied Plaintiffs' Motion to Substitute with leave to refile. In particular, this Court noted that Plaintiffs' motion was deficient under Rule 25 because Plaintiffs had not filed a statement of the fact of death on the record and were trying to substitute "the Estate of Edward K., Jr." in place of Edward K., Jr. The estate of a deceased party is not a proper party under Rule 25.

Despite this guidance and leave to refile a conforming motion, Plaintiffs' have still not filed a formal statement of the fact of death on the record or identified a proper party for substitution. Plaintiffs' second motion seeks to substitute "the Estate of Edward K., Jr." (Cuddy Aff., ¶ 2.) Once again, the Estate of Edward K., Jr. is not a proper party. A proper party under Rule 25 must be a legal representative of the deceased. See Sinito v. United States Dep't of Justice, 176 F.3d 512, 516 (D.C. Cir. 1999.) For example, proper parties would include "(1) a successor of the deceased party – a distributee of an estate if the estate of the deceased has been distributed at the time the motion for substitution has been made, or (2) a representative of the deceased party – a person lawfully designated by state authority to represent the deceased's estate." Roe v. City of New York, No. 00 Civ. 9062, 2003 WL 22715832, at *2 (S.D.N.Y. Nov. 19, 2003). Accordingly, Plaintiffs' Second Motion to Substitute Party is denied.[11]

**B. Plaintiffs' Motion to Amend/Correct**

Plaintiffs filed their response in opposition to Springville's Motion for Summary

---

[11] It does not appear as though substitution is essential in any event. First, all of the causes of action brought on behalf of J.K. continue to be prosecuted by his mother, Sally K. Second, as discussed herein, none of Plaintiffs' claims, including the parents' claims, survive summary judgment, a fact that would not change even if a proper party was substituted for Edward K.

Judgment on June 14, 2004. Included in that response was a pleading captioned "Statement of Undisputed Facts." Local Rule 56.1(b),[12] however, requires that a party opposing summary judgment include "a separate, short, and concise statement of the material facts as to which it is contended *that there exists* a genuine issue to be tried." (Emphasis added.) Rather than asserting material facts that are in dispute, Plaintiffs' response to Springville's motion identifies undisputed facts.

Springville identified additional deficiencies in Plaintiffs' response papers. In its reply memorandum, Springville correctly points out that Plaintiffs failed to adhere to Local Rule 56.1(d), which requires that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, as required by Federal Rule of Civil Procedure 56(e)."

However, despite having received notice of these deficiencies via Springville's reply memorandum, filed on June 28, 2004, Plaintiffs waited almost three months (and just 6 days before oral argument) to move to amend or correct their pleadings. Plaintiffs' counsel asserts that his inexperience in federal litigation led to the filing of an incorrect Local Rule 56.1 statement. (Cuddy Aff., ¶ 4.) That may be so, but it does not explain counsel's considerable delay in seeking to amend or correct Plaintiffs' pleadings, especially since counsel had notice of the deficiencies as of June 28, 2004. Accordingly, this Court finds that the favorable exercise of its discretion is not warranted. Plaintiff's Motion to Amend/Correct will be denied.

---

[12]Referring to the Local Rules of Civil Procedure for the United States District Court for the Western District of New York.

### C. Springville's Motion for Summary Judgment

#### 1. District Court Review Under the IDEA

IDEA actions in federal court are appropriately resolved by examination of the administrative record in a summary judgment posture. See Rye Sch. Dist., 345 F.Supp.2d at 395. In this context, however, the existence of disputed issues of material fact will not defeat summary judgment. Rather, "[f]ederal courts reviewing administrative determinations under the IDEA must base their decisions on 'the preponderance of evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." Grim, 346 F.3d at 380 (citing 20 U.S.C. § 1415(i)(2)(B). Both the United States Supreme Court and the Second Circuit interpret the IDEA as "strictly limiting judicial review of state administrative decisions." Grim, 346 F.3d at 380-81 (citing Rowley, 458 U.S. at 204-08 and Walczak, 142 F.3d at 129); Sherman v. Mamaroneck Union Free Sch. Dist., 340 F.3d 87, 93 (2d Cir. 2003).

The district court's inquiry is two-fold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Rowley, 458 U.S. at 206-07 (footnote omitted); see also Grim, 346 F.3d at 381. It is the burden of the school districts to prove by a preponderance of evidence that the answer to both questions is yes. See Rye Sch. Dist., 345 F.Supp.2d at 395.

In conducting this inquiry, district courts must give "due weight" to administrative decisions, "mindful that the judiciary generally lacks the specialized knowledge and

experience necessary to resolve persistent and difficult questions of educational policy." Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206). Judges must afford significant deference to the state educational agencies' decisions and avoid imposing their own educational methods on the states. See Watson, 325 F.Supp.2d at 144-45. For example, "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." Grim, 346 F.3d at 382.

The administrative decision in this case to which this Court must give due weight and deference is the Goldsmith Decision. This Court turns to it now.

**2. The Goldsmith Decision**

In this litigation, Plaintiffs allege that Springville violated the IDEA by denying J.K. a FAPE as follows:

> Defendants have denied [J.K.] a FAPE in the LRE [least restrictive environment] by failing to provide an educational plan that confers an educational benefit because [J.K.'s] IEP is not reasonably calculated to enable him to receive an educational benefit, and the IEP throughout the 2002-2003 school year did not conform to the decisions of Impartial Hearing Officer Turetsky and State Review Officer Frank Munoz.
>
> Defendants have denied [J.K.] a FAPE in the LRE by failing to provide regular or special education and related aids and services that are designed to meet [J.K.'s] individual educational, social, emotional and management needs of students with disabilities as adequately as the needs of students without disabilities are met. Specifically, the Defendants have denied [J.K.] the implementation of the decisions of IHO Turetsky and SRO Munoz, which would have addressed his individual needs.

(Third Amended Complaint, ¶¶ 31, 32.)

These claims and others were presented to IHO Goldsmith over the course of 8 days beginning on June 9, 2003. Hearings before IHO Goldsmith were conducted on June 9 and 30, July 21, August 1, September 22 and November 4, 2003. (Goldsmith Decision, at 3.) Additional telephone conferences were conducted on May 22 and October 22, 2003. (Id.) Eight witnesses were presented by Springville, 1,141 pages of hearing transcript were recorded, and 130 exhibits were received into evidence. (Id.)

The specific procedural and substantive issues before IHO Goldsmith were as follows:

- whether Springville implemented the orders of IHO Turetsky, dated August 13, 2002, and SRO Munoz, dated January 15, 2003;
- whether the Superintendent engaged in conduct that was a willful violation of SRO Munoz's orders when he allegedly intimidated the district staff members of the CSE into not implementing the decision of SRO Munoz;
- whether J.K.'s IEP was appropriate and whether it provided J.K. with a FAPE;
- whether CSE appropriately evaluated J.K.;
- whether the Board of Education willfully ignored its responsibility to review a report of the evaluations upon which the CSE recommendation for J.K. was based;
- whether J.K.'s IEP contained the mandated elements required by the Regulations of the Commissioner of Education;
- whether the teachers and staff working with J.K. were appropriately trained or certified;
- whether a teacher with a background in working with autistic children was providing transitional support services for J.K.;
- whether J.K.'s levels of performance were accurately reflected and indicated on the IEP in a manner consistent with the Regulations of the Commissioner of Education;

- whether the IEP accurately reflects the recommendations of the CSE;
- whether J.K.'s needs were accurately reflected on the IEP;
- whether the duties of the aide are reflected on the IEP and whether the aide is appropriately trained;
- whether the prior decision of IHO Paul Bumbalo is being implemented.

(Id. at 2.)

On November 25, 2003, in what can only be described as a highly detailed, incredibly thorough 60-page written decision, IHO Goldsmith concluded that, aside from two procedural defects, Plaintiffs' due process complaint was "totally lacking in merit." (Id. at 59-60.) As will be discussed in more detail below, IHO Goldsmith concluded that Springville correctly implemented the Turetsky and Munoz Decisions and provided J.K. with a FAPE. He also concluded that the two procedural deficiencies did not affect J.K.'s educational experience. Plaintiffs' appeal of the Goldsmith Decision was denied by SRO Paul F. Kelly on April 6, 2004.

### 3. Has Springville Complied with IDEA's Procedural Requirements?

Addressing Plaintiffs' procedural objections, IHO Goldsmith rejected the claim that the CSE did not appropriately evaluate J.K. as IHO Turetsky had ordered. (Id. at 34-38.) Rather, IHO Goldsmith found that the CSE's retention of Ted J. Andrews, Ph.D, to conduct a functional behavior assessment of J.K. satisfied IHO Turetsky's directive that Springville conduct such an assessment as it saw fit. (Id. at 36.)

IHO Goldsmith also rejected Plaintiffs' claims that the Board of Education had a duty to review J.K.'s IEP and that it failed to review the evaluations upon which the IEP was

based. (Id. at 38-43.) IHO Goldsmith also determined that the IEP (1) adequately contained a report of J.K.'s level of performance (Id. at 47), (2) appropriately did not reflect a prior IHO Order from the 2001-2002 school year (Id. at 48-51), and (3) accurately reflected J.K.'s needs (Id. at 51-56).

Plaintiffs provide no persuasive evidence or argument challenging IHO Goldsmith's conclusions, and this Court finds them to be well supported in the administrative record.

IHO Goldsmith sustained Plaintiffs' objections on two points. First, he found that the IEP failed to specify the transitional support services to be provided to J.K. as required by the state education regulations. (Id. at 43-45.) Second, he found that the IEP did not include specific information regarding the function of the aide as ordered by SRO Munoz. (Id. at 56-57.) On both points of objection, however, IHO Goldsmith found that the procedural defects did not interfere with J.K.'s learning or his receipt of a FAPE. (Id. at 45, 60.) In particular, IHO Goldsmith stated: "It must be noted that the two inadequacies in question do not impinge on the provision of FAPE. Neither was shown to have resulted in the loss of educational opportunity or to have infringed on the Parents' opportunity to participate in the IEP formulation process." (Id. at 60.)

Having reviewed the Goldsmith Decision in its entirety, as well as the evidence in the 5-volume administrative record supporting the decision, this Court concurs with the conclusion that the two procedural deficiencies did not impinge J.K.'s receipt of a FAPE. As to the first error, Plaintiffs argue that J.K. was denied transitional support services by a teacher with a background teaching students with autism. However, as IHO Goldsmith found, the regulations do not require that J.K. himself be provided transitional support from

an individual with a background in autism, but rather, that school personnel receive such support. (Id. at 44.) Plaintiffs offer nothing on this motion compelling a different conclusion.

As to the second point, Plaintiffs offer no evidence that the failure to include J.K.'s aide's duties in the IEP deprived him of a FAPE. In fact, it is specifically noted in the Goldsmith Decision that this was a purely technical violation: J.K. did in fact receive assistance from a 1:1 aide. (Id. at 57.) For example, based on evidence in the record, IHO Goldsmith found that

> The aide remains with [J.K.] in the integrated class, and accompanies him, among other places, to the small group instruction sessions in Reading and Math and to Music, Art, Library and Physical Education (T-101-102, 153). The aide travels with [J.K.] throughout the day, with the exception of lunch (T-481). "She attempted to provide him with support assignments in class. That was her primary function," Mr. McCabe[13] testified (T-481)."

(Id. at 56-57 (footnote added).)

Therefore, the deficiency arose not because J.K. was being denied an aide, but rather, because the aide's duties (that she *was* performing) were not specifically written in the IEP as required by SRO Munoz. (Id.) Thus, it is clear that at no time was J.K. deprived of any of the supportive services he was entitled to because of this technical error in the IEP.

Accordingly, this Court finds that the two procedural deficiencies identified in the IEP are minor, and do not rise to a level warranting relief under the IDEA. See Grim, 346 F.3d at 381 ("[not every] procedural error in the development of an IEP renders that IEP illegally

[13] Mr. Patrick McCabe was J.K.'s special education teacher. (Goldsmith Decision, at 3, 5.)

inadequate under the IDEA"). Plaintiffs have presented this Court with no additional evidence outside of the administrative record suggesting that these two technical deficiencies deprived J.K. of a FAPE.

**4. Is J.K.'s IEP Reasonably Calculated to Enable Him to Receive Educational Benefits?**

Turning to Plaintiffs' substantive objections, IHO Goldsmith first rejected Plaintiffs' claims that J.K.'s IEP was more restrictive than permissible under the Turetsky and Munoz Decisions as a misreading of those decisions. (Id. at 8 (noting that Plaintiffs' pivotal argument was without merit).) Plaintiffs argued that the Munoz Decision (which upheld the Turetsky Decision) required Springville to keep J.K. in the inclusion class for reading and math. IHO Goldsmith rejected this argument and instead found that "Munoz did not decree that every educational service be presented to [J.K.] every moment of the day in a classroom composed of regular and special education students." (Id. at 11.) He also found that IHO Turetsky never directed inclusion classes for all subjects: "Notably, IHO Turetsky declined to make a recommendation on how [J.K.] was to receive his instruction in English and Math." (Id. at 11 (emphasis in original).) Rather, IHO Turetsky determined that Springville had not demonstrated that regular classroom placement was inappropriate. (Id.)

After thorough analysis, IHO Goldsmith concluded that "the CSE, far from violating an order of SRO Munoz, used its permissible discretion to plan for a mindful inclusion placement, one which contemplated pulling [J.K.] out of the combined class and placing him in a 1:12:1 setting for a limited time each day to address his specific needs. In this way, in the manner implemented by the District, the Child stood a chance of learning how to read

and write and improving his limited abilities in Math." (Id. at 14.)

In addition, IHO Goldsmith rejected Plaintiffs' claim that J.K.'s IEP did not provide a FAPE. In this regard, Plaintiffs' continued to argue that J.K. was being denied a FAPE because he was being placed out of his integrated class each day for specialized small group instruction in English and Math and was not being taught via the same method as other students. (Id. at 20-21.) In twenty pages of analysis, IHO combed through the record evidence and thoroughly addressed each of Plaintiffs' arguments. (Id. at 14-34.) Based upon his review of the evidence, including evidence of J.K.'s stark deficiencies in English and Math, to which he cites and reproduces at length in his decision, IHO Goldsmith concluded that Springville "has indeed met its burden of showing that [J.K.'s] IEP was specifically designed to meet his unique needs, supported by such placement and services as were 'necessary to permit him to benefit,' to the maximum extent possible,' from instruction.'" (Id. at 32 (citing Rowley, 458 U.S. at 200).)

Upon review of the record, this Court finds that IHO Goldsmith's determinations on the substantive points of Plaintiffs' objections are wholly supported with record evidence and fully supported by the testimony offered during the hearing. (See id. at 33-34.) That is, there is sufficient support in the administrative record to conclude that J.K.'s IEP satisfied the substantive requirements of the IDEA. See Watson, 325 F.Supp.2d at 145. IHO Goldsmith thoroughly examined each point of objection and found that Springville's IEP for J.K., in essence, provided J.K. the best opportunity to excel. Cf. Walczak, 142 F.3d at 130 ("[a]n appropriate public education under IDEA is one that is likely to produce progress, not regression"). Plaintiffs' have offered no evidence or persuasive argument to the

contrary, or for their bare allegation that the Goldsmith Decision is "poorly reasoned." (Plaintiffs' Memorandum of Law, ¶ 4.) In addition, class placement and method of instruction, such as in this case whether J.K. should be educated in a pull-out session using a whole word approach for English and reading, is precisely the type of educational strategy and methodology requiring deference to the expertise of the administrative officers. Grim, 346 F.3d at 382; Watson, 325 F.Supp.2d at 145 (finding that class size, peer group, and type of instruction all involve "questions of methodology more appropriately answered by the state and district decision-makers").

Accordingly, this Court finds that based on the record evidence, J.K.'s IEP substantially complied with the procedural prerequisites of the IDEA, and it was reasonably calculated to ensure that J.K. received educational benefits. See Watson, 325 F.Supp.2d at 145 ("So long as the administrative record provides sufficient support that the substantive contours of the IEP are reasonably calculated to confer educational benefits . . . it is not within a Court's purview to upset the programming recommended by the CSE.").

**5. Plaintiffs' Non-IDEA Claims**

In addition to their IDEA claim, Plaintiffs assert claims under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq., the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq., and the Fourteenth Amendment via 42 U.S.C. § 1983. (Third Amended Complaint, ¶¶ 36-63.) These alternative claims, however, are redundant, as they rely on the same set of facts as the IDEA claim. Springville therefore seeks dismissal of the non-IDEA claims based on issue preclusion. Plaintiffs expended none of their limited

effort[14] in opposing summary judgment defending their non-IDEA claims from dismissal. As such, because there is no opposition to Springville's request and because Plaintiffs' non-IDEA claims are barred by issue preclusion, this Court will dismiss those claims. See Pace v. Bogalusa City Sch. Bd., No. 01-31026, 2005 WL 546507, at *17 (5th Cir. Mar. 16, 2005) (issue preclusion barred Rehabilitation Act and ADA claims where those claims were factually and legally indistinct from the failed IDEA claim); Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996) (similar); Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 728 (10th Cir. 1996) (similar).

## IV. CONCLUSION

This Court finds, as did IHO Goldsmith, that J.K.'s IEP for 2002-2003 was reasonably calculated to confer educational benefits on J.K.. Moreover, the two minor procedural deficiencies did not affect J.K.'s receipt of a FAPE. As such, for the reasons stated herein, Springville's Motion for Summary Judgment on Plaintiffs' IDEA claim is granted and Plaintiffs' non-IDEA claims are dismissed. Finally, Plaintiffs' Motions for Substitution and to Amend/Correct are denied.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Second Motion to Substitute Party (Docket No. 82) is DENIED.

FURTHER, that Plaintiffs' Motion to Amend/Correct (Docket No. 83) is DENIED.

---

[14]This Court notes that in addition to filing an improper Local Rule 56.1 Statement, and in addition to failing to appear for oral argument, Plaintiffs' 7-page memorandum of law leaves much to be desired as it contains not a single citation to legal authority, nor does counsel's opposing affidavit cite to or provide any *evidence* supporting Plaintiffs' allegations or arguments.

FURTHER, that Springville's Motion for Summary Judgment (Docket No. 64) is GRANTED as to Plaintiffs' IDEA claim.

FURTHER, that Plaintiffs' non-IDEA claims are DISMISSED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: March 28, 2005
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge